IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


LINETTE FOSTER,                          )        CASE NO. 1:14CV2376
                                         )
                   Plaintiff,            )
                                         )
        v.                               )
                                         )        MAGISTRATE JUDGE
                                         )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                   )
SECURITY ADMINISTRATION,                 )
                                         )        **MEMORANDUM OPINION & ORDER**
                   Defendant.            )


        Plaintiff Linette Foster ("Foster") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying her application for Supplemental

Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc.

18.

        For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

### I. Procedural History

        Foster filed an application for SSI on June 7, 2010, alleging a disability onset date of

January 1, 2010.  Tr. 13, 296, 319.  She alleged disability based on the following: multiple

fractures to left leg.  Tr. 323.  After denials by the state agency initially (Tr. 109) and on

reconsideration (Tr. 133), Foster requested an administrative hearing.  Tr. 153.  Two hearings

were held before Administrative Law Judge ("ALJ") Cheryl Rini; the first on June 14, 2012 (Tr.

55-108) and the second on February 7, 2013 (Tr. 29-54).[1]  In her May 13, 2013, decision (Tr. 13-22), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Foster can perform, i.e., she is not disabled.  Tr. 20.  Foster requested review of the ALJ's decision by the Appeals Council (Tr. 9) and, on August 29, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Foster was born in 1964 and was 46 years old on the date her application was filed.  Tr. 20, 319.  She completed eighth or ninth grade.[2]  Tr. 324, 34.  She has no past relevant work.  Tr. 35.

### B.  Medical Evidence

**Physical:** In January 2010, Foster fractured her ankle (distal tibia and fibula).  Tr. 495-498.  Later that month, orthopedic surgeon John Wilber, M.D., performed surgery on her ankle and inserted plates and screws.  Tr. 431-432.   Subsequent x-rays and notes from follow-up visits with Dr. Wilber through September 2010 indicate a well-healed incision and a fracture healed in anatomical alignment.  Tr. 417-423.  Foster consistently had good range of motion and strength but complained of some aching pain and tightness in her ankle.  Tr. 417-423.

Foster participated in post-operative physical therapy from March 2010 to May 2010.  Tr. 419, 437-493.  At her last visit on May 26, 2010, she reported that her overall pain was improving.  Tr. 487.  She met all short-term and long-term goals.  Tr. 488.  She reported 50%

---

[1]  The ALJ held a second "supplemental" hearing because, during the first hearing, it became clear that the record was not yet complete.  Tr. 64, 97, 105.

[2]  Foster's disability report states that she completed eighth grade.  Tr. 324.  When asked at the hearing, "what is the highest grade you completed in school?" Foster answered, "Ninth.  I didn't finish."  Tr. 34.

improvement in symptoms and demonstrated an improved gait and a normal ability to navigate stairs, albeit "just a little slow."  Tr. 488.

On August 16, 2010, Foster visited a general practitioner complaining of persistent left ankle and lower back pain.  Tr. 521.  She was observed to be neurologically intact, but had tenderness and swelling in her left ankle and walked with a mild limp.  Tr. 522.

On January 31, 2011, one year after her ankle surgery, Foster again saw Dr. Wilber.  Tr. 424.  Dr. Wilber wrote that overall she was doing well.  Tr. 424.  Foster reported some aching pain in her ankle, especially with weather changes, and using a cane "because of discomfort." Tr. 424.  Dr. Wilbur found her to have excellent, pain-free range of motion in her ankle.  Tr. 424.  An x-ray revealed a well-healed fracture, but also that "a couple of the distal screw heads have backed out of the plate slightly."  Tr. 424.  Dr. Wilbur opined that most of Foster's complained-of pain was due to irritation from the hardware in her ankle; he recommended hardware removal. Tr. 424.

On February 23, 2011, Foster saw Bradley McCrady, D.O., complaining of pain in her lower back, left ankle, and right shoulder.  Tr. 581-583.  Upon examination, Dr. McCrady found Foster had a decreased range of motion of all planes in her neck and her midline lumbosacral spine was tender to palpation.  Tr. 582.  She had near normal range of motion in her left ankle but was tender to palpation along her distal fibula.  Tr. 582.  She had full strength in her bilateral leg muscles but pain induced weakness of her left ankle and positive Tinel sign at her anterior ankle into her dorsal foot.[3]  Tr. 582.  Her heel-to-toe walking was limited by her left ankle pain. Tr. 582.  Dr. McCrady diagnosed Foster with lumbar spondylosis, ankle and foot pain, and muscle spasms.  Tr. 584.

---

[3]  "Tinel sign" is described as "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1716.

On April 12, 2011, Foster saw Rebecca Schroeder, M.D., for a follow-up to an emergency room visit for a dog bit to her right arm and right foot.  Tr. 622-628.  Dr. Schroeder noted that Foster was pleasant and, upon physical exam, had a supple neck.  Tr. 626.  She was on antibiotics and her wounds were healing.  Tr. 622.

An x-ray of Foster's left ankle taken on May 25, 2011, revealed a well-healed fracture with a partially withdrawn surgical screw.  Tr. 597.

On June 27, 2011, Foster again saw Dr. Wilber.  Tr. 630.  Dr. Wilber observed that she had left ankle tenderness, but her ankle was stable with a good range of motion and she had normal neurocirculatory findings.  Tr. 630.  He again recommended surgery to remove at least two screws because they were causing skin irritation.  Tr. 630.

On August 11, 2011, physiatrist[4] Krishan Khera, M.D. observed mild tenderness upon palpation of Foster's left ankle.  Tr. 598.  Otherwise, she had a near normal range of motion in her ankle and the ability to bear weight.  Tr. 598.

In September 2011 the loose screws in Foster's ankle were removed.  Tr. 621, 632.  At a follow-up appointment with Dr. Wilber the following week, Foster requested additional narcotic pain medication.  Tr. 632.  Dr. Wilber advised that narcotic medications were "unnecessary for this type of procedure."  Tr. 632.  At a subsequent follow-up visit with Dr. Wilber on October 24, 2011, Foster reported some mild aching pain but overall improvement.  Tr. 724.  Dr. Wilber recommended that she continue with her independent rehabilitation and see him again in two to three months.  Tr. 724.

---

[4]  A physiatrist is a physician who "deals with the prevention, diagnosis, and treatment of disease or injury, and the rehabilitation from resultant impairments and disabilities, using physical agents such as light, heat, cold, water, electricity, therapeutic exercise, and mechanical apparatus, and sometimes pharmaceutical agents."  Dorland's, at 1443.

On November 15, 2011, Foster saw Dr. Schroeder complaining of left shoulder pain, neck pain, and lower back pain radiating down into her lower extremities.  Tr. 647.  Her physical examination was generally normal, including a supple neck, although she had paraspinal muscle tenderness at C3-4.  Tr. 648.  An X-ray of her cervical spine showed degenerative disc disease at the C5-C6 and C6-C7 levels.  Tr. 653.

On December 9, 2011, Foster began physical therapy for her lower back pain.  Tr. 657.  She reported difficulties climbing stairs, lifting, doing housework, and prolonged walking.  Tr. 658.  Her therapist found that she had decreased hip and core strength, increased lordosis, tightness in her hip, an abnormal gait, and poor body mechanics.  Tr. 659.

On December 30, 2011, Foster saw physiatrist Andrew Greenwood, M.D., complaining of pain in her left foot and left hip.  Tr. 685-688.  Upon examination, Dr. Greenwood found Foster had an unsteady tandem walk, she did not use an assistive device to ambulate, she had a positive straight leg raise at 80 degrees,[5] decreased deep tendon reflexes in her ankles bilaterally, and swelling in her left foot.  Tr. 687-688.  She demonstrated full muscle strength in both legs.  Tr. 687.  Dr. Greenwood diagnosed her with trochanteric bursitis and limb pain.  Tr. 688.

An EMG performed on January 10, 2012, was unremarkable, revealing no evidence of lumbar radiculopathy or left ankle neuropathy.  Tr. 699.  On January 24, 2012, Foster saw Dr. Greenwood for a follow-up visit; Dr. Greenwood documented similar findings as the previous visit.  Tr. 704-707.

On June 8, 2012, Foster saw Dr. Schroeder to complete forms for her social security application.  Tr. 718.  Upon examination, Foster had tenderness in her left hip, cervical spine,

---

[5]  In a straight leg-raising test, the patient lies down supine, fully extends the knee, and lifts the leg.  *See* Dorland's, at 1900.  Leg pain when the leg is raised 30-90 degrees (a positive straight leg raise) indicates lumbar radiculopathy.  *Id.*

and tenderness and swelling in her right ankle.  Tr. 720.  Dr. Schroeder administered a steroid injection to Foster's hip and Foster reported that she was pain-free after the injection.  Tr. 720.

On August 13, 2012, Foster saw Dr. Wilber again.  Tr. 725.  He noted that she had been doing relatively well and improved upon the removal of the screws in her left ankle.  Tr. 725.  She was still mildly tender over the tibia plate in her ankle but there was no prominence.  Tr. 725.  She had an "excellent range of motion and strength."  Tr. 725.  An X-ray showed mild soft tissue swelling but intact hardware.  Tr. 726.

**Mental:**  On August 16, 2010, at an appointment with her general practitioner, Foster requested a referral to help with her anger management.  Tr. 521.

On May 13, 2011, Foster was evaluated by psychologist Anita Gantner, Ph.D.  Tr. 612-615.  Dr. Gantner noted that Foster had worked inconsistently for most of her life and had a history of substance abuse.  Tr. 613-614.  Foster complained of agitation, anhedonia, depression, feelings of hopelessness, increased isolation, irritability, past suicidal thoughts, and decreased frustration tolerance.  Tr. 613.  Upon examination, Foster had an organized thought process, adequate memory, and was distractible.  Tr. 614.  She had a depressed mood and a low fund of knowledge.  Tr. 614, 615.  Her eye contact was fleeting, her behavior guarded, and she was lethargic.  Tr. 614.  She had poor judgment and her insight was within normal limits.  Tr. 614.  Dr. Gantner recommended alcohol rehabilitation and referred her to psychiatry for evaluation of pharmacological intervention for her depression.  Tr. 615.

On July 19, 2011, Foster saw Dr. Gantner again so that she could be re-referred to psychiatry.  Tr. 600.  Foster reported that a few weeks prior, when she had been drinking, she considered suicide but was no longer suicidal upon waking the next morning.  Tr. 600.

Dr. Gantner noted that Foster did not follow through on her previous recommendations for alcohol rehab because Foster believed she could do it on her own.  Tr. 600.  Dr. Gantner again strongly recommended alcohol rehab and noted that Foster's drinking was complicating her depression.  Tr. 600.

On September 12, 2011, Foster saw psychiatric nurse Tina Oney for a mental health assessment.  Tr. 639-644.  Foster listed her symptoms as depression, agitation, decreased concentration, increased isolation, and daily drinking.  Tr. 639.  Upon examination, Oney found Foster to have an angry and irritable mood, but otherwise observed generally normal findings including cooperative behavior, logical thought process, fair insight and judgment, and a good memory.  Tr. 641.  Oney assigned a GAF score of 41-50.[6]  Tr. 641.  She referred Foster to a substance abuse counselor and recommended a treatment frequency of every three months.  Tr. 643.

Foster saw Oney again on December 21, 2011.  Tr. 669.  Foster reported that she was very unfocused, had a low IQ, poor social skills, and was unable to adequately describe her depressive symptoms.  Tr. 669.  Oney observed that Foster was unfocused and required redirection to stay on topic when discussing her mental health, but found her to have generally normal mental findings upon examination, including cooperative behavior, good memory, and sustained concentration and attention. Tr. 669.  Oney opined, "this is a very difficult patient due to her low IQ."  Tr. 669.

---

[6]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

She assessed a GAF of 51-60.[7]

### D.  Medical Opinion Evidence

#### 1.  Treating Source Opinion

On June 8, 2012, Dr. Schroeder completed a Physical Medical Source Statement form. Tr. 712-716.  She stated that she had seen Foster three times, beginning in April 2011.  Tr. 712. Dr. Schroeder opined that Foster could walk one block at one time without rest or severe pain; stand for thirty minutes at a time; sit for more than two hours at a time; and, in an eight-hour workday, sit for two hours total and stand/walk for less than two hours total.  Tr. 712.  She stated that Foster would need to change positions throughout the workday, take hourly breaks lasting thirty minutes, elevate her legs 2-3 feet 25% of the workday because of back pain and ankle swelling, and use an assistive device for standing/walking.  Tr. 713-714.  She stated that Foster could rarely lift less than ten pounds, could rarely climb stairs, and could never perform other postural maneuvers.  Tr. 714.  She could only use her left arm/hand for manipulative tasks for 10% of the workday.  Tr. 714.  Finally, Dr. Schroeder opined that Foster was incapable of "low stress" work, would be off-task for 25% or more of the workday, and would miss more than four days of work per month due to her impairments or treatment.  Tr. 715.

#### 2.  Consultative Examiners

**Physical:** On April 1, 2011, Foster saw Mehdi Saghafi, M.D., for a physical consultative examination.  Tr. 587-594.  Foster reported ankle pain every other day and sometimes every day. Tr. 587.  Upon examination, Dr. Saghafi found that Foster walked with a limp on her left ankle, had positive straight leg raising bilaterally at 80 degrees, and pain in her left ankle with movement; he also observed that the head of a pin was palpable under Foster's skin.  Tr. 589.

---

[7]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR, at 34

Based on Foster's history and objective findings, Dr. Saghafi opined that Foster could sit for 6-8 hours per day, stand and walk for 2-3 hours per day with an ambulatory aid, lift and carry objects but could not push or pull objects, could manipulate objects and hand controlled devices, and could climb stairs one level at a time.  Tr. 589-590.  He found that her speech, hearing, memory, orientation, and attention were within the normal range.  Tr. 590.

**Mental:** On September 29, 2010, Foster underwent a psychological consultative examination with psychologist Herschel Pickholtz, Ed. D.  Tr. 562-570.   She stated that she was unable to work because of her problems with her left ankle.  Tr. 562.  She described experiencing mild depression twice per year, with each occurrence lasting one hour.  Tr. 564.  Dr. Pickholtz observed that Foster had a constricted affect with a passive/aggressive and exaggerated mood.  Tr. 564.  Her motivation and degree of cooperation was below average—she put forth little effort during the evaluation, including not answering questions fully or directly, and tended to exaggerate.  Tr. 564.  Testing revealed a full-scale IQ score of 44 and other well below-average findings; however, Dr. Pickholtz opined that Foster was not a reliable and accurate respondent and that her scores were adversely affected by her exaggeration, malingering, and, possibly, alcohol abuse.  Tr. 568, 570.  He opined that her IQ was more likely in the low average range.  Tr. 567-568.

Overall, Dr. Pickholtz opined that Foster was mildly impaired in her ability to understand, remember, and carry out instructions and moderately impaired in her ability to maintain attention to perform simple repetitive tasks, relate to others, and withstand the stress and pressure associated with work activities.  Tr. 568-569.  He assigned a GAF score of 55 and diagnosed Foster with alcohol abuse, malingering, and personality disorder "related to addictive and passive/aggressive features with exaggeration."  Tr. 569.

### 3. State Agency Reviewers

**Physical**: On September 5, 2010, state agency physician Nick Albert, M.D., reviewed Foster's file.  Tr. 115-116.  Dr. Albert opined that, although Foster's ankle fracture and surgery was a severe physical impairment, it was not expected to last for one year.  Tr. 116, 119.

On April 13, 2011, state agency physician Elizabeth Das, M.D., reviewed Foster's file. Tr. 129-130.  Regarding Foster's residual functional capacity ("RFC") assessment, Dr. Das opined that Foster could: lift twenty pounds occasionally and ten pounds frequently; stand/walk for four hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently balance, kneel, crouch and crawl; occasionally climb; and frequently operate controls with her left foot.  Tr. 129-130.

**Mental:** On October 11, 2010, state agency reviewing psychologist Marianne Collins, Ph.D., reviewed Foster's file.  Tr. 117.  Dr. Collins opined that Foster's mental impairments were not severe.  Tr. 117.

On April 18, 2011, state agency reviewing psychologist Caroline Lewin, Ph.D., reviewed Foster's file and affirmed Dr. Collins' opinion.  Tr. 127-128.

### E. Testimonial Evidence

### 1. Foster's Testimony

Foster was represented by counsel and testified at both administrative hearings.  Tr. 32-47, 57-108.  She lives with her mother in her mother's house.  Tr. 85.

Foster testified that her major physical problem is her left ankle.  Tr. 40.  She has plates on both sides of her ankle.  Tr. 40.  She is in pain all the time and the doctor told her she has to keep her left ankle elevated.  Tr. 40.  The pain is a burning pain on the left side close to the screws.  Tr. 40.  She has 12 screws left (after having had two removed).  Tr. 40.  The pain gets

worse when the weather is cold and rainy.  Tr. 40.  She also has burning pain in her left side from her hip down to her knee.  Tr. 41.  She has to keep moving because it hurts like she has a cramp. Tr. 41.  The pain is always there and she "ha[s] to get up and walk it off" a couple times a day. Tr. 41.  She sits in a recliner every day so that she can elevate her ankle.  Tr. 41.  If she did not have a chair that permitted her to elevate her ankle, she would "be in pain and like drugging myself taking more pills."  Tr. 43.  Her pain "sometimes" hurts more if she sits in a "normal chair."  Tr. 44.

Foster stated that her doctor was giving her injections in her hip.  Tr. 44.  The injections help for a month and she has not had one for "awhile."  Tr. 44.  She also has pain in her neck. Tr. 44.  She has back problems: "my back go[es] out on me" and when she goes to the emergency room they give her an IV and put ice it.  Tr. 46.  She stated that, because of her back, her doctor told her not to lift over seven pounds.  Tr. 46.  She could not remember which doctor told her this.  Tr. 46-47.  She has problems sleeping because of pain on her left side.  Tr. 92.

When asked about Dr. Schroeder's opinion that Foster requires a cane, Foster stated, "I need a cane every now and then."  Tr.  100.  She uses it every time she leaves the house and sometimes in the house.  Tr. 42, 100, 104.  When she walks she gets tired and, sometimes, out of breath.  Tr. 103.  Inside the house, she may use it "once in 20 minutes if I have to walk up and down the steps" in the house.  Tr. 42.  It also "feels a little bit better if I stand up with it."  Tr. 42. She can stand for 15 minutes without using her cane and then gets tired.  Tr. 42.  She got the cane from Dr. Wilber after her first surgery when she "started trying to learn how to [] walk right."  Tr. 44, 101.  At the time, she could not put any weight on her left foot and could not walk at all.  Tr. 44-45.  She stated that she has been in a boot to teach her how to walk "all over" and she uses the cane because it hurts and she has been tripping on her foot.  Tr. 101.  She also uses a

bandage that she places on her leg when it swells to keep the swelling down.  Tr. 101.  She last used "the bandage probably about four months ago."  Tr. 101.  She also stated that she used "it" twice in the last six months and "just took it off the other day."  Tr. 102.[8]  She testified that she was told that she has another "pin ... sticking out" of her ankle.  Tr. 102.  After Dr. Wilber removed the screws that were previously backing out of the plate, "it stopped the pain for a minute" but then she sprained her ankle.  Tr. 103.  She explained that she was told, "if I have more pain, he said he might have to go in and take all of the stuff out and that will have me sitting like this for the next two months."  Tr. 47.

Foster testified about her prescribed medication.  Her Naproxen prescription was a thirty-day supply filled seven months prior to the hearing; half the pills remained.  Tr. 77.  Her antidepressant Citalopram was filled seven months prior to the hearing, was a thirty-day supply, and there were five left.  Tr. 78.  Likewise her Cyclobenzaprine, a muscle relaxant.  Tr. 78.  She stopped taking her folic acid because she believed it was affecting her vision.  Tr. 78.  She needed a refill on her anti-depressant, Celexa.  Tr. 80.  She did not have her prescribed Gabapentin or Neurontin and stated, "I probably need to get another prescription [] of that."  Tr. 80.  She takes two Aleve or Advil every day.  Tr. 79, 82.  When asked why she did not take all her prescribed pills, Foster stated, "being hard headed sometimes, like people say you don't keep taking them then they'll mess you, they'll come back, your pain will come back, you know, you think you feel much better."  Tr. 90.  The doctors tell her to finish taking her medication but she stops taking it and the pain comes back.  Tr. 90.  With respect to her medication to treat her depression, she admits that she notices that, when she resumes takes her pills after having not taken them, "all of a sudden it seems like it ain't doing nothing for me."  Tr. 91.

---

[8]  At the hearing, Foster spoke of her cane, a "boot" to teach her to walk, and "a bandage" for swelling.  Tr. 101.  It is not clear from the transcript whether she was referring to her "boot" or her "bandage" in this portion of her testimony.

At the first hearing, Foster testified that the last time she had an alcoholic drink was "a beer, occasionally," the week before.  Tr. 76.  When asked about a treatment note from January 2011 indicating that she drank one to two 40 ounce beers a day and one pint of liquor a week, Foster stated, "it wasn't every day.  It was just like I would go out with somebody drinking with, not by myself."  Tr. 84.  She stated that the person entering notes in the record "must have misunderstood" her because "I drink it with somebody.  I don't drink by myself."  Tr. 84-85.  Her pattern of alcohol use has gotten "a little bit better" lately; she has an alcoholic drink once every two weeks or so.  Tr. 85.  She reduced her intake because her doctors told her to stop.  Tr. 85-86.

Foster stated that she used marijuana a few months ago: "I just tried it.  I don't really smoke it."  Tr. 93.  The ALJ commented, "that's not what the records say . . . . the records say that you use marijuana quite a bit, frequently."  Tr. 93.  Foster declared, "no."  Tr. 93.  The ALJ remarked that she first assumed that Foster may have been using it to relieve her pain, to which Foster replied, "Yeah, ... I don't sit there like, [] I get high off of it every day, no, I don't do that, ... it was just like an occasion, just hanging out or something, you know, just to take the pressure off my mind or something."  Tr. 93-944.  She last used cocaine about a year ago.  Tr. 94.  She "once or twice" took pain medication that was not prescribed to her and described taking oxycodone for a toothache that her friend gave her, explaining that the emergency room would not see her for a toothache and that it was painful.  Tr. 95.

### 2. Vocational Expert's Testimony

Vocational Expert James Primm ("VE") testified at the second hearing.  Tr. 48-53.  The ALJ asked the VE to determine whether a hypothetical individual of Foster's age, education and lack of work experience could perform work if that person had the following characteristics: can

lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk four hours in an eight-hour workday; sit six hours in an eight-hour workday; frequently use foot controls with her left lower extremity; can occasionally climb ladders, ropes, ramps, stairs and scaffolds; and can frequently crouch, kneel, balance and crawl.  Tr. 48-49.  The VE answered that such an individual could perform jobs as a fundraiser (7,900 Ohio jobs; 467,000 national jobs); information clerk (5,800 Ohio jobs; 658,000 national jobs); and ticket taker (1,900 Ohio jobs; 31,000 national jobs).  Tr. 49.

Next, the ALJ asked the VE whether the same hypothetical individual could perform jobs if the individual is able to lift/carry 20 pounds occasionally and 10 pounds frequently; sit/stand/walk six hours in an eight-hour workday; can only occasionally use foot controls with her left lower extremity; can never climb ladders, ropes, or scaffolds; can never crawl or kneel; can perform other postural maneuvers occasionally; must avoid concentrated exposure to cold, vibrations using vibrating hand-held tools or on vibrating surfaces; and must avoid work at unprotected heights, around hazards, or on wet, slippery or uneven surfaces.  Tr. 49.  The VE answered that such an individual could perform the jobs previously mentioned. Tr. 49.  Foster's attorney asked the VE to clarify whether the individual could perform the aforementioned jobs if she could occasionally balance or bend.  Tr. 50.  The VE confirmed that the individual could still perform the jobs mentioned.  Tr. 50.

Next, the ALJ asked the VE to determine whether a hypothetical individual of Foster's age, education and work experience could perform work if that person had the following characteristics: can lift/carry 10 pounds occasionally and small objects frequently; stand/walk two hours in an eight-hour workday with regular breaks; sit six hours in an eight-hour workday with regular breaks; occasionally use foot controls with her left lower extremity; and all other

14

limitations from the second hypothetical.  Tr. 50.  The VE replied that such an individual could perform work as a ticket counter (1,800 Ohio jobs; 50,000 national jobs); addresser clerk (600 Ohio jobs; 23,000 national jobs) and order clerk (1,700 Ohio jobs; 44,000 national jobs).  Tr. 50-51.

The ALJ asked the VE to determine whether a hypothetical individual of Foster's age, education and work experience could perform work if that person had the following characteristics: can lift/carry 10 pounds occasionally and small objects frequently; stand/walk two hours in an eight-hour workday; sit six hours in an eight-hour workday with regular breaks; must elevate her left leg when seated; cannot use foot controls with her lower extremities; and all other limitations from the second and third hypothetical.  Tr. 51.  The VE asked whether the foot would need to be elevated to waist level and the ALJ answered that it would.  Tr. 51.  The VE stated that such an individual could not perform any work, based on the individual's need to raise her leg coupled with her age and education level.  Tr. 51-52.

Next, Foster's attorney asked the VE to consider what kind of impact it would have if the individual described in the ALJ's third hypothetical would need to use a cane or ambulatory aid when standing.  Tr. 52.  The VE answered that such an individual could still perform the three jobs previously mentioned.  Tr. 52.  Foster's attorney then added the additional limitation that the individual would need to change position at will.  Tr. 53.  The VE stated that, if such a limitation would mean that the individual would be off-task more than ten percent of the workday, there would be no work the individual could perform.  Tr. 53.  If the individual is able to change positions at will and remain on-task, the individual could perform two of the three jobs previously mentioned—addresser and ticket counter.  Tr. 53.  The remaining position, order

clerk, would no longer be an option. Tr. 53. The VE stated, however, that the individual could perform work as a call-out operator (900 Ohio jobs; 53,000 national jobs).

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[9] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her May 13, 2013, decision, the ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since June 7, 2010, the date the application was filed.  Tr. 15.

2.  The claimant has the following severe impairments: fracture distal end of left tibia (left ankle fracture) status post open reduction internal fixation with chronic pain; osteoarthritis of cervical spine; trochanteric bursitis left hip.  Tr. 15.

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 17.

4.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can lift or carry 20 pounds occasionally and 10 pounds frequently.  She can stand or walk at least 6 hours in an 8-hour day with normal breaks about every 2 hours.  She can occasionally use foot controls with her left lower extremity.  She cannot climb any ladders, ropes or scaffolds, knee[l] or crawl.  She can perform all other postural maneuvers on an occasional basis.  She should avoid concentrated exposure to cold temperature extremes and vibration, therefore, no work on vibrating surfaces and no work using vibrating

---

[9] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

hand held tools.  She should avoid work at unprotected heights and around hazards.  She should avoid work on wet, slippery or uneven surfaces.  Tr. 18.

5.    The claimant has no past relevant work.  Tr. 20.

6.    The claimant was born on February 24, 1964 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 20.

7.    The claimant has a limited education and is able to communicate in English.  Tr. 20.

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 20.

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 20.

10.   The claimant has not been under a disability, as defined in the Social Security Act, since June 7, 2010, the date the application was filed. Tr. 21.

## V. Parties' Arguments

Foster objects to the ALJ's decision on two grounds.  She argues that the ALJ did not properly evaluate the medical opinion evidence, including the opinion of Foster's treating physician, Dr. Schroeder, in determining Foster's physical RFC.  Doc. 16, pp. 3, 10-16.  She also argues that the ALJ erred when she found that Foster did not have a severe mental impairment at Step Two.  Doc. 16, pp. 3, 16-18.  In response, the Commissioner submits that substantial evidence supports the ALJ's evaluation of the medical opinion evidence and her Step Two finding that Foster did not have a severe mental impairment.  Doc. 19, pp. 8-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ properly evaluated the medical opinion evidence

Foster argues that the ALJ failing to follow the treating physical rule when she evaluated Dr. Schroeder's opinion.  Doc. 16, p. 10.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

With respect to Dr. Schroeder's opinion, the ALJ recited the limitations assessed by Dr. Schroeder: that Foster could stand and walk less than two hours and sit about two hours in an eight-hour day; could rarely lift more than ten pounds; would need to keep her leg elevated and would require a sit/stand option; could never stoop; and would be absent four days a month.  Tr. 19.  In according "no weight" to this opinion, the ALJ explained,

> Dr. Schroeder established a treating relationship with the claimant on April 5, 2011 when she treated the claimant for a dog bite and low back pain.  Dr. Schroeder described the claimant as pleasant.  None of Dr. Schroeder's notes on the four times she examined the claimant would suggest such strict restrictions.  Specifically, Dr. Schroeder observed the claimant to be tender to the touch over stated areas of pain in her neck, back, shoulder and ankles, with no indication of restrictions in range of motion, strength, sensation or ambulation.  Dr. Schroeder observed straight leg raising to be negative.  Dr. Schroeder's opinion appears strictly based on the claimant's stated limitations due to pain.  Lastly, Dr. Schroeder's opinion is not consistent with the observations of the claimant's treating orthopedists that observed the claimant to have pain, but otherwise noted normal range of motion in her extremities, the ability to bear weight, ambulate effectively, and to maintain normal strength and reflexes.

Tr. 19.

Foster asserts that the ALJ "appl[ied] a 'pick and choose' method of reading the medical evidence."  Doc. 16, p. 12.  She contends, for example, that Dr. Schroeder's opinions are supported by her own treatment notes.  Doc. 16, p. 12.  Foster fails to identify any of Dr. Schroder's treatment notes that contain a finding of left ankle swelling, restricted motion, positive straight leg raises, or decreased reflexes.  Indeed, Dr. Schroeder found none of these symptoms when examining Foster, including on the day she rendered her opinion assessing severe work-related restrictions.  *See* Tr. 622-628 (April 12, 2011, notes); 647-650 (November 15, 2011, notes); 693-696 (January 9, 2012, notes); 718-720 (June 8, 2012, notes).  The ALJ accurately stated that Dr. Schroeder's opinion was not supported by her own treatment notes.

Foster asserts that other evidence in the record supports Dr. Schroeder's opinion.  Doc. 16, p. 12.  She points to her physical therapist's notations that she has difficulty climbing stairs,

lifting, doing housework and prolonged walking, as well as to her own subjective reports reflected in the record.  Doc. 16, p. 12 (citing Tr. 658, 685).  The notations by Foster's physical therapist were based on Foster's reports, underscoring the ALJ's conclusion that Dr. Schroeder's opinion was based strictly on Foster's "stated limitations due to pain."  Tr. 19.  Additionally, the ALJ observed that Foster, on occasion, did have positive straight leg raising, but that this occurred at 80 degrees, a mild result.  Tr. 19.  Although, as Foster points out, there are indications in the record of an unsteady gait, decreased deep tendon reflexes and range of motion in Foster's ankle (Tr. 685-688), there is ample evidence to the contrary, as observed by the ALJ.  *See* Tr. 19 (citing Tr. 605 (Dr. Khera's finding of near normal range of motion in Foster's left ankle); Tr. 707 (Dr. Greenwood's findings of full strength, sensation, and range of motion); Tr. 582 (Dr. McCrady's finding of near normal range of motion in left ankle)).  Furthermore, Foster does not identify evidence that would support the severe restrictions found by Dr. Schroeder.  As noted by the Sixth Circuit, the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence."  *White v. Comm'r of Soc. Sec*., 572 F.3d 272, 284 (6th Cir. 2009) (rejecting plaintiff's argument that the ALJ cherry-picked portions of treatment notes that depicted her condition in a positive light and ignoring more troubling aspects).

The ALJ also remarked that EMG testing and x-ray results of Foster's ankle and lumbar spine were primarily normal, with the exception of the loosening screws a year after her surgery, which were removed.  Tr. 18, 19.  Accordingly, the ALJ properly evaluated Dr. Schroeder's opinion when she considered whether her opinion was entitled to controlling weight.  *See Wilson*, 378 F.3d at 544 ("[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.");

*Brasseur v. Comm'r of Soc. Sec.*, 525 Fed. App'x 349 (6th Cir. May 7, 2013) (the ALJ reasonably concluded that the severe restrictions assessed by treating physicians were not entitled to controlling weight and gave good reasons for disregarding them when the opinions were not supported by the doctors' own treatment notes and other objective medical evidence in the record).

Moreover, the ALJ gave good reasons for the weight she assigned to Dr. Schroeder's opinion.  She considered the length, nature, and extent of the treatment relationship (Dr. Schroeder examined Foster four times in over one year, initially because of a dog bite and low back pain); specialization of the physician (Dr. Schroeder's opinions were not consistent with observations of Dr. Wilber, Foster's treating orthopedist); the supportability of the opinion (not supported by Dr. Schroeder's own treatment notes); and the consistency of the opinion with the record as a whole ("Dr. Schroeder's opinion appears strictly based on [Foster's] stated limitations due to pain," and inconsistent with Dr. Wilber's findings).  Tr. 19; *see* 20 C.F.R. § 416.927(a)-(d).

Foster argues that Dr. Schroeder's opinion was consistent with the opinion of consultative examiner Dr. Saghafi.  Doc. 16, p. 13.   First, although Dr. Saghafi found Foster's ankle was painful with motion and observed, "[the] area is tender and the head of the pin is palpable under the skin" (Tr. 589), this finding was prior to her second surgery to remove the screws which, the ALJ remarked, improved Foster's pain levels.  Tr. 19.  The ALJ gave "limited weight" to Dr. Saghafi's opinion, explaining that his notes indicated that she could walk unaided, albeit with a limp, yet his opinion states that she needs an ambulatory aid.  Tr. 20, 589.  The ALJ also cited evidence in the record that Foster was able to ambulate without an assistive device

"and could easily move between sitting and standing."  Tr. 19 (citing Tr. 707, Dr. Greenwood's treatment notes).

Finally, the ALJ remarked that Foster's complaints of pain were not supported by the record.  Tr. 20.  She observed that Foster complained of pain levels between 5/10 and 10/10 yet waited ten months to have the offending screws taken out of her ankle after Dr. Wilber suggested removing them.  Tr. 20.  Foster reported that Flexeril helped her symptoms and she did not consistently seek pain management.  Tr. 20.  She maintained good muscle tone in her back, neck, shoulder, hip, and ankles and responded well to stretching and strength training.  Tr. 20.  *See Thomas v. Barnhart*, 105 Fed. App'x 715 (6th Cir. 2004) (ALJ properly discounted opinion evidence based in part on the claimant's subjective reports, "many of which were not supported by the objective medical findings.").  And, despite Foster's assertion to the contrary, it is the ALJ, not a medical source, who is responsible for "evaluating the medical evidence and the claimant's testimony to form an assessment of [her RFC]."  *Webb. v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (quoting 20 CFR §416.920(a)(4)(iv)); *see also* 20 CFR § 404.1546(c) ("the administrative law judge ... is responsible for assessing your residual functional capacity.").

In sum, the ALJ properly evaluated the opinion evidence and did not violate the treating physician rule when considering Dr. Schroeder's opinion.

### B. The ALJ did not err at Step Two

Foster argues that the ALJ erred when she did not find that Foster had a severe emotional impairment.  Doc. 16, p. 16.  She asserts, "[a]lthough Plaintiff did not have an extensive treatment record, there was sufficient evidence to support a finding of a severe emotional impairment.  Doc. 16, p. 16.

A court "defer[s] to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'" *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).  Here, the ALJ cited substantial evidence to support her conclusion that Foster's mental impairment was not severe.  Tr. 16-17.  She noted that Foster "frequently failed to follow through with prescribed treatment," including alcohol cessation and counseling, despite Dr. Gantner's observation that Foster's depression was complicated by her alcohol problem.  Tr. 16.  She remarked that, when Foster first sought treatment for anger management, she acknowledged recent marijuana, cocaine, and alcohol use.  Tr. 16.  She observed that Foster denied depressive symptoms, anxiety, and sleeplessness in February 2011.  Tr. 16 (citing Tr. 581; Foster also denied inattention and disorientation); *see also* Tr. 564 (Foster reporting to Dr. Pickholtz that she had depressive symptoms twice a year that lasted for one hour).  The ALJ commented that Dr. Pickholtz opined that Foster's unusually low IQ testing results were adversely affected by Foster's tendency to exaggerate and, possibly, her alcohol abuse.  Tr. 16.  She concurred that she, too, believed that Foster exaggerated her symptoms at the hearing.  Tr. 17.  She referenced Dr. Pickholtz's diagnosis that Foster was malingering.  Tr. 17.  She cited to further evidence that Foster was observed by providers as consistently presenting with good hygiene and being cooperative and pleasant.  Tr. 16, 19.  Finally, it bears mentioning that state agency reviewing psychologists Drs. Collins and Lewin opined that Foster's mental impairments were not severe. Tr. 117, 127; *see Cieslinski v. Comm'r of Soc. Sec.*, 2010 WL 819074, at *3 (N.D. Ohio Mar. 9, 2010) (substantial evidence in the record supported the ALJ's determination that the claimant's

mental impairment was not severe; state agency reviewing psychologists found no severe mental impairment and the ALJ additionally cited to several medical records in support of her finding).

Foster argues that evidence in the record shows that she exhibited decreased concentration, agitation, and other similar behavior. Doc. 16, p. 17. Not all Foster's cited references support her assertion; for example, although Nurse Oney noted Foster's depression evidenced by her "depressed mood" and "psychomotor agitation," and found her mood angry and irritable, she also, upon mental exam, found Foster to be cooperative; oriented to time, person and place and with clear, normal, goal-directed speech; logical and organized in her thought process with tight association; and to have fair insight and judgment and good recent and remote memory and recall. Tr. 641-642, 669. Oney herself did not observe Foster to have difficulty with attention and concentration; she noted that Foster reported that her attention span and concentration were "difficult." Tr. 641. The ALJ remarked upon Dr. Gantner's observations, including Foster's fleeting eye contact and guarded demeanor, and noted that, despite Dr. Gantner's opinion that Foster's depression was complicated by her alcohol problem, Foster did not follow through on Dr. Gantner's prescribed rehabilitation. Tr. 16.

Finally, Foster argues that Dr. Schroeder opined that Foster "would be off-task more than 25% or more of the work day and is incapable of low stress work due to her social skills and poor concentration." Doc. 16, p. 18. This is incorrect; although Dr. Schroeder assigned these limitations to Foster, she did not explain what caused these limitations despite the form's invitation to do so. *See* Tr. 715. In short, substantial evidence supports the ALJ's conclusion that Foster's mental impairment is not severe and the ALJ's decision therefore must be affirmed. *Jones*, 336 F.3d at 477.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

Dated: October 19, 2015

Kathleen B. Burke
United States Magistrate Judge